O’Neall, J.
The naked question in this ease is, whether an administrator, selling the personal estate of his intestate, under the order of the Ordinary, can be allowed to become the purchaser, when he sells fairly *310 and pays the full value ? I think he can ; and in this respect executors and administrators constitute an exception to the rule that “ a trustee to sell cannot purchase.”
On tracing this question through the various cases decided, it will be found that no' decision against this position has been made. In the earliest case which can be found, that of Drayton v. Drayton, 1 Eq. Rep. 557, 567, the Chancellors, Matthews and Rutledge, decided the very point, in exact conformity to what I conceive to be both law and equity. Speaking of a purchase made by G. Drayton, one of the testator’s executors, at the sale of his estate, they say : — “ As to G. Drayton’s pur-, chase at the sale of the testator’s estate, we consider it in the same light as that of any other individual; there is no law which prohibits an executor purchasing (without fraud) any property of his testator, at open and public sale.” This was in 1797, and until M’Guire v. McGowen, 4 Eq. Rep. 486, (in 1814) the country remained quietly under the rule settled by the case of Drayton v. Drayton. In that case the precise question now before the Court did not arise; the defendant was the husband of the administratrix, and guardian ad litem of the minors in a proceeding in partition in the Common Pleas, in which the land of the intestate was ordered to be sold, and of which, at the sale made in pursuance of the said order, he became the purchaser. It was held by a majority of the Court, that his purchase was valid. In 1817, in the case of Perry v. Dixon, reported in a note, 4.Eq. Rep. 504, the question was made, whether an executor’s purchase, at his own sale, was good ? The Court, without adverting to Drayton v. Drayton, which was a direct decision of the point arising in the case, and thus constituted a rule (as I can conee*ve) *for their government, decided the case as one of J novel impression. Chancellor Waties, holding that an executor, as a trustee to sell, could not be allowed to purchase at his own sale, Chancellor De Saussure said “he was not prepared to go the whole length of the principle” laid down by Chancellor Waties : “that would (he said) exclude executors and administrators from purchasing on their own account, at sales of the estates under their charge, in any case whatever, and thus place them entirely on the footing of mere trustees.”— “ Perhaps a wise policy would place them on that footing, where they ■had no interest; but where they have an interest in the property, it would seem to be too severe a rule to prohibit executors and administrators from purchasing at such sales, at least to the extent of their interest.” Chancellor James concurred in the principle maintained by Chancellor Waties — Chancellors Gaillard and Thomas dissented, and were for reversing Chancellor Waties’ decree. From this time to 1824, there were a variety of cases involving, in a greater or less degree, the principle maintained by Chancellor Waties, in Perry v. Dixon: but in none of them did it receive the sanction of the Court. In the case of Bullock v. Williams and wife,(a) the purchase made by Mrs. Williams, who was the administratrix of her former husband, at her own sale, was attempted to be set aside, and was supported by the Circuit Chancellor, on the ground of its fairness. That decree was affirmed by the Court of Appeals, or acquiesced in by counsel thoroughly acquainted with the current of de *311 cisions. So far as I am aware, the question, divested of circumstances of actual or legal fraud, has not been presented to the Court of Appeals since 1824. In Edmunds v. Crenshaw & M’Morris, 1 M’C. Ch. Rep. 252, it was adjudged by Chancellor Thompson, that the purchase of the executor, M’Morris, at the sale made by himself and his co-executor, was void, and his decree was affirmed by the Court of Appeals. But in that case the defendant, M’Morris, never complied with the terms of the sale, and was, from insolvency, incapable of paying the price at which he made the purchase, at the time the decree was pronounced. So that that decision can be maintained upon other principles: and I know that the recovery was not rested by the plaintiffs upon the abstract principle of equity, that a trustee to sell is not allowed to buy at his own sale. In Trimmier v Trail, 2 Bail. 484, I indicated my opinion on this question : and as I am *about giving utterance to that opinion more formally and authoritatively, it is not necessary to take any more specific notice u' of that case. In ex parte Wiggins, 1 Hill’s Ch. Rep. 353, my brother Harper, with the concurrence of the whole Court, laid down the rule, that the purchase of a trustee to sell was voidable on the application, and at the instance, of any of his cestui que trusts. On looking into'that case, it will be seen it was a sale and purchase by an assignee : and does not therefore conclude the exception now insisted on, in favor of executors and administrators. After this review of the adjudications in this State, it will be seen that the case of Drayton v. Drayton has never been reversed; and that, on the score of authority, the exception for which I contend is made out.
But independent of this, it is enough for my purpose, that in establishing a principle of law, I am not guilty of the unpardonable sin (as some seem to think it) of reversing some ill-advised and hasty opinion of our own, or of our respected predecessors.
In Perry v. Dixon, Chancellor De Saussure, with his usual good judgment, thought that executors and administrators ought not to be put on the footing of mere trustees: and I hope to be able to demonstrate, that so far as the question before us is concerned, they are not, and they cannot be so regarded.
At common law, an executor or administrator is the legal owner of the goods and chattels of the testator or intestate ; and before 1824, he could legally dispose of them to another, without even the order of the Ordinary. The goods and chattels of the testator, after the payment of debts and legacies, were formerly, both at law and in equity, the property of the executor. So too, an administrator, by paying the debts and the shares of the distributees, without even a sale, would, in England, have made the goods of the deceased his own. In England, and in this State, until 1145, P. L. 202, the executor or administrator could only be called on to account for the appraised value of the testator or intestate’s goods. This was the only standard by which creditors, legatees or distributees, could charge him. To the goods themselves, if aliened or wasted, they had no right: and until 1145, executors or administrators might lawfully take the goods as their own, at the appraised value. In 1145, the Legislature recited, that “Whereas a custom hath too much prevailed among executors and administrators, of taking estates or some parts thereof, at *312 *4(181 ^e aPPra^ement, when such appraisement *hath been under the 4 true value,” and for remedy thereof, enacted, “that no executor or administrator shall hereafter be permitted to take any estate, or any .part thereof, at the appraisement, and that no appraisement, to be made as aforesaid, shall be binding or conclusive, either upon the creditors, legatees, next of kin, or other person interested in such estates, or upon the executors or administrators; but all, and every such executors and administrators, shall be accountable and chargeable for the true value of such estates, any practice to the contrary notwithstanding.”
This review of the rights and liabilities of executors and administrators at common law, and under the Act of 1745, clearly shows, that by paying the true value, they might acquire, as against their cestui que trusts, the goods of their testator or intestate. For the Act of 1745 restricts their general ownership to an acquisition for the true value. This certainly shows, that an executor or administrator was something more than a mere trustee : for if he paid the full value of the goods to the creditors, neither they nor the next of kin could question his rights. Let it be remembered, that an executor or administrator never was a mere trustee to sell: his trust was and is, to collect the personal assets of the deceased, to pay debts and legacies, and the residue to distribute according to the will or the law. In 1745, the Ordinary was not authorized to order sales of the personal estate to be made: in 1789, he was clothed with that power, for division, payment of debts, or to prevent the loss of perishable articles: and in 1824, the executor (when not authorized by the will to sell) and the administrator were prohibited from selling without the permission of the Ordinary. These several acts make, as I conceive, the prerequisites to the validity of a purchase, by an executor or administrator, that the sale should have been fairly made by the authority of the will, or by the order of the Ordinary, in a case in which he had jurisdiction, and that the price is the true value of the goods. If this be not the result of the Acts of 1824, 1789, and 1745, some one of them must be inoperative. This will not be contended for.
. An executor or administrator, however, cannot be regarded as a mere agent to effect a sale. He generally is greatly interested in the estate of which he has the management. Is he to be excluded from acquiring a favorite slave, when he is willing to give more than every other bidder ? Can it be that his purchase at one dollar more than A.’s bid, shall be set *4091 as^e > an<4 yet, if be bad suffered the *property to go off at A.’s 4 bid, the sale would have been good ? The reason of the rule— the prevention of secret frauds in the purchases of trustees to sell — does not apply to sales made by executors or administrators. They are made in public, in the neighborhood where the property is known, the sale is conducted by an indifferent person, an auctioneer employed for the occasion ; if fraud is committed, it is obliged to be known to the spectators or auctioneer, and can therefore be proved; and hence there is no necessity for an artificial rule to prevent its perpetration.
The application of the principle, that a trustee to sell cannot be allowed to purchase at his own sale, to executors or administrators, would often compel executors to decline to qualify as such: and would prevent the widow or children of an intestate from claiming the right of administration, guarantied to them by law. For if they assume any of *313 these characters, (i. e. executors or administrators,) under the rule stated, they cannot buy any of the personal property of the deceased, which may be sold under the will, or the order of the Ordinary. The fight to buy at such sales is often of essential importance to persons named executors, the widow and the children ; and hence, if as executors or administrators they could not buy, they would be compelled to forego the executorship, or administration. This would be making a mere rule of equity, intended to subserve justice, work a positive legal wrong, and carry out and enforce the grossest injustice.
For these reasons, I have come to the conclusion, that an executor or administrator is not to be regarded as a mere trustee to sell: that his own purchase at Ms own sale, when fairly made in pursuance of the will, or under the order of the Ordinary in a case of which he had jurisdiction, for the true value of the goods and chattels so sold, is good; and must be supported both in law and equity.
In this case, the administrator has shown that he sold by the order of the Ordinary, in a case of which he had jurisdiction; that the sale was fairly made, and that he purchased at the true value.
■ It is therefore ordered and decreed, that so much of Chancellor De Saussure’s decree, as sets aside the administrator’s purchase of the slave August, be reversed.
Johnson and Harper, Js., concurred.

An Act of the Legislature was passed on the 18th December, 1835, entitled, “An Act to reform and amend the Judi- L . ciary System of this State,” which repealed the Act of 1824, establishing a Court of Appeals; and provides, that from the Judges of the said Court of Appeals, two shall be designated by ballot of both branches of the Legislature, to act as Chancellors, and that the remaining Judge shall perform the duties of a Judge of the Courts of Law; and that the Law Judges and Chancellors, shall meet and sit at Columbia on the fourth Monday in November, and the third Monday in July, — and at Charleston on the first Monday in January, and the fourth Monday in April, in each year, “for the purpose of holding the Court of Appeals, in hearing and determining all motions which may be made for new trials, and in arrest of judgment, and such points of Law and Equity as may be submitted to them, with the same powers now exercised by the Court of Appeals : Provided, that not less than a majority of the Law Judges, and a majority of the Chancellors, shall hold said Court; and provided also, that no Chancellor or Law Judge, by or before whom a case has been heard or tried, shall > exercise appellate jurisdiction thereupon in said Court.”
In pursuance of this Act, and in the same session, -the Hon. David Johnson, and the Hon. Wm. Harper, were designated by ballot as Chancellors; and consequently, the Hon. J. B. O’Neald, the remaining Judge, became a Judge of the Courts of Law.

Not reported.